# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION



| | | |
|---|---|---|
| **VALERIE ALLEN,** | ] | |
| Plaintiff(s), | ]<br>]<br>] | |
| vs. | ] | CV-01-N-2718-S |
| **UNITED PARCEL SERVICE, INC.,** | ]<br>]<br>] | |
| Defendant(s). | ] | |

**Memorandum of Opinion**

## I. Introduction

The plaintiff, Valerie Allen, ("Allen") brings this action alleging that her employer, defendant United Parcel Service, Inc. ("UPS"), discriminated against her on the basis of her gender and retaliated against her because she previously had filed discrimination charges with the Equal Employment Opportunity Commission (the "EEOC"), all contrary to the provisions of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"); and 42 U.S.C. § 1981 ("Section 1981").

The action is presently before the court on UPS's motion for summary judgment, filed on July 31, 2002 (Doc. #22). As noted in Exhibit D to the Court's November 20, 2001, Initial Order (Doc. #3), Allen's opposition to UPS's motion for summary judgment was due to be filed on August 21, 2002. Though the time for her to do so has long since passed, Allen has filed no response to the motion. Neither has she sought leave to submit a response out of time. After careful consideration of the materials and arguments submitted by UPS, the



applicable law, and the record as a whole, the motion for summary judgment is due to be granted in all respects.

**II.     Statement of Facts**[1]

Plaintiff Valerie Allen is an African-American female who has been employed by UPS since 1983. At the time material to her claims, Ms. Allen was a "feeder" driver, assigned to transport packages on tractor-trailer rigs between and among various UPS facilities. Specifically, her route, RB06, ran from UPS's Roebuck facility near the Birmingham, Alabama, airport to a similar facility in Montgomery, and back to the Roebuck facility. Ms. Allen was assigned to RB06 through a bidding process wherein more senior drivers are allowed to choose the more preferred routes. The plaintiff's regular assignment called for her to depart Roebuck at approximately 8:30 p.m., drive to Montgomery, and return to Roebuck by about 4:30 a.m.[2]

Ms. Allen claims that UPS forced her to work excessive hours, while her male counterparts, with less seniority, were not required to work similar hours. Specifically, she claims that trips to White's Creek, near Nashville, Tennessee; Goodwater, near Sylacauga, Alabama; and Anniston, Alabama, were added to her route because she is a female and in retaliation for her earlier complaints of discrimination. (*Complaint* ¶¶ 23-26).

---

[1] In developing the statement of facts in this opinion, the court considered the facts proposed by the parties and the court's own examination of the evidentiary record. These are the "facts" for purposes of this opinion only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[2] The actual driving time involved was approximately three and one-half hours.

2

**A.     The Longer Routes**

Allen claims that UPS discriminatorily required her to make runs to White's Creek, Nashville on July 13, 2000 and July 24, 2000. On July 13, 2000, the load that was scheduled to go to the UPS White's Creek facility was particularly "heavy" (meaning that the driver could not accommodate more packages). (Raley Aff. ¶ 6). Allen's supervisor, Scott Raley, exhausted several options in an effort to find an alternative feeder driver who could carry the extra load. He eventually asked driver Dennis Scott to give up his day off and to make a delivery to Atlanta, while Ms. Allen made the extra run to White's Creek. When she was informed she would be assigned to take the load to White's Creek, the plaintiff stated she would prefer the Atlanta delivery. Scott was unwilling to make the change, however, because he felt he was unprepared on such short notice to make the longer trip to Nashville. *Id.*

On July 24, 2000, UPS received notice at 8:20 p.m. that it would be necessary to send an unscheduled load to White's Creek in order to accommodate an overflow of packages destined for that facility. All other available drivers had already begun work, while Allen was scheduled to begin work at 8:30 p.m. (Raley Aff. ¶ 10). Allen contends that there were other drivers "in the yard" with less seniority who she believed should have been called before her. (Allen Dep. pp. 80, 198-99, 203-04). Although all of the other drivers had assigned routes and had already begun their shifts, she contends she was entitled to the right of first refusal. (Allen Dep. pp. 199-201). In response to this assignment, Allen filed grievances against UPS. They were denied. (Allen Dep. DX3, DX7; Raley Aff. ¶¶ 9-10).

Allen also claims that UPS discriminatorily required her to return to Roebuck through Goodwater to transport a loaded trailer to Goodwater. (Allen Dep. pp. 84, 98). In mid-year 2000, UPS's Alabama District began to experience an influx of "overflow" packages into the Montgomery Hub that were destined for the UPS Goodwater facility, which is located near Sylacauga. (Price Aff. ¶ 7; Blaine Aff. ¶ 4). Packages that had previously been sent directly to Goodwater were being rerouted to UPS's Atlanta facility through UPS's Montgomery Hub. (Price Aff. 7; Blaine Aff. ¶ 4). Allen became upset when Paul Thomas told her that she would need to make a stop in Goodwater as part of her run. (Allen Dep. at pp. 94, 98, 102-03). Allen blames Tony Blaine, one of the Montgomery supervisors, for the addition of the Goodwater leg, both individually and as a representative of UPS. (Allen Dep. pp. 93-94, 118, 144). Allen became upset when she discovered that male Birmingham drivers with less seniority were bringing the feeder trailer loads back to Roebuck that she had typically hauled from Montgomery to Roebuck. (Allen Dep. pp. 104-06, 108-09). In response, Allen filed grievances with the union, but the union never found that a contract violation occurred. (Price Aff. ¶ 13).

Allen further claims that UPS discriminated against her when Tony Blaine required her to return through Anniston on the RB06 route approximately fifteen times between August 2000 and February 2001. Once again Allen contends that her seniority should have given her the right to refuse this assignment. (Allen Dep. pp. 123-34; 135-36). She maintains that other male workers could have been pulled for the job, but were not selected. (Allen Dep. 129).

### B.  Retaliation

On September 20, 2000, Allen filed a Charge of Discrimination with the EEOC which is the underlying charge for this lawsuit. (Allen Dep. DX1). She filed previous Charges of Discrimination with the EEOC against UPS on or about 1986 or 1987 and her retaliation claim is based upon her previously filed EEOC charges from the 1980's. (Allen Dep. pp. 73, 154-55, 158-59). Allen contends that Raley's decision to add the White's Creek route was a result of her EEOC charges. Raley denies knowledge of the EEOC complaints at the time the decision was made. (Raley Aff. ¶ 14). Peter Price also says that he was not aware of any EEOC charges when he assigned Allen the Goodwater leg. (Price Aff. ¶14). Finally, Tony Blaine denies knowledge of any EEOC charges filed by Allen when he assigned her the Anniston route. (Blaine Aff. ¶ 13).

### III.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.*Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. His guide is the same

standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 746 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### IV.     Allen's Disparate Treatment Claims

####     A.     General Analytical Framework

If Allen is to prevail on her disparate treatment claims, she must submit some proof of her employer's discriminatory motive, that is, some causal link between her race and the actions of which she complains. *See Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000). In a Title VII case such as this, where the plaintiff relies solely upon circumstantial evidence, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 & n. 6 (1980), 101 S. Ct. 1089, 1094 & n. 6, 67 L. Ed. 2d 207 & n. 6. "Demonstrating a prima facie case is not onerous, it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Lathem v. Department of Children & Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999). In this case, Allen's prima facie case requires proof that she was: (1) a member of the protected group (2) subjected to an adverse employment action (3) qualified to do the job; and (4) replaced or lost the position to someone outside of that protected group. *Jones v. Bessemer Carraway Med. Center*, 137 F.3d 1306, 1310 (11th Cir. 1998); *McDonnell Douglas*, 411 U.S. at 802; *Id.* at 802 n.13; *accord Chapman*, 229 F.3d at 1024 (summarizing the factors in an ADA disparate treatment case).

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the employer to articulate a "legitimate nondiscriminatory reason" for the alleged discriminatory employment action. *Lathem*, 172 F.3d at 793. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by

8

the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Chapman*, 229 F.3d at 1024 (quoting *Burdine*, 450 U.S. at 254-55, 101 S. Ct. at 1094 (citation and footnote omitted)).

After the employer presents a legitimate nondiscriminatory reason for its action, the presumption of discrimination is eliminated leaving the elements of the prima facie case. *Id.* at 1024-25. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the employer was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *Id.* The plaintiff may meet this burden by persuading the fact-finder either directly that a discriminatory reason more than likely motivated the employer, or indirectly that the employer's proffered explanation is unworthy of belief. *Id.* If the plaintiff succeeds in meeting this burden, the disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination and preclude summary judgment. *Id.* at 1025.

### B. Allen's Discrimination Claims

#### 1. Prima Facie Case

In determining whether Allen has established a prima facie case, the court must decide whether routing Allen through White's Creek, Goodwater, and Anniston, amounted to an adverse employment action. Whether an action is adverse is decided on a case-by-case basis. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000). One court summarized, "'[w]hile not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions or privileges of employment does constitute adverse action.'" *Shannon v. BellSouth*

9

*Telecommunications, Inc.*, 2002 WL 1155772 (11th Cir. 2002) (quoting *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001). "An employee must show a *serious and material* change in the terms, conditions, or privileges of employment. . . . the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. When, as here, the alleged action is a change in working conditions, the "adversity" threshold is especially high. In *Davis v. Town of Lake Park Florida*, the Eleventh Circuit indicated an adverse employment action would only be found in "unusual circumstances [where the change is] so substantial and material that it does indeed alter the 'terms, conditions or privileges of employment.'" 245 F.3d 1232, 1245 (11th Cir. 2001); *see also Martinez v. U-Haul Co.*, 2001 WL 648637 (N.D. Ill. 2001) (noting "A materially adverse change in the terms and conditions of employment . . . must be more disruptive than a mere inconvenience or alteration of job responsibilities."). Yet courts have also indicated that what amounts to a materially adverse action may vary according to the type of employment. *See Reed v. Cracker Barrel Old Country Store*, 133 F. Supp. 2d 1055, 1070-71 (M.D. Tenn. 2000) (noting that an adverse employment action includes "other indices that might be unique to a particular situation.") (quoting *Hollins v. Atlantic Co.*, 88 F.3d 652, 662 (6th Cir. 1999)).

      UPS correctly points out that Allen was fully compensated for her additional hours. An adverse employment action however, is not a purely economic consideration. Allen's deposition indicates, as a result of the increased driving time, she experienced swelling in her ankles, severe hemorrhoids and muscle spasms." (Allen Dep. at p. 167). Other courts

10

have held that requiring the plaintiff to work longer shifts to be enough to establish an adverse employment action. *See, e.g. Reed*, 133 F. Supp. 2d at 1071 (waitress required to work longer shifts suffered adverse employment action); *Martinez*, 2001 WL 648637, at 15-16 (citing Seventh Circuit precedent holding that performing additional job tasks within the scope of assigned job responsibilities sufficient to establish adverse employment action); *Hernandez-Torres v. Intercontinental Trading Inc.*, 158 F.3d 43, 47 (1st Cir. 1998) (significantly longer hours sufficient to establish adverse employment action). Allen has established that the extra working hours had adverse health consequences which materially affected the terms and conditions of her employment. Viewing the facts in the light most favorable to Allen, this court will assume without holding that the additional routes and hours were sufficient to establish an adverse employment action.

### 2.     **UPS's Legitimate Nondiscriminatory Reasons**

Assuming, without deciding, that Allen has made out a prima facie case of intentional discrimination, the burden shifts to UPS to articulate one or more "legitimate, non-discriminatory reasons for its employment action." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). This burden is "exceedingly light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138 (11th Cir. 1983), and the defendant "need only offer admissible evidence sufficient to raise a genuine issue of material fact as to whether it had a legitimate reason." *Hill v. Seaboard C.L.R. Co.*, 767 F.2d 771 (11th Cir. 1985).

#### a.     **White's Creek**

UPS has provided an exhaustive list of reasons why it chose to route its packages in the matter that it did. To summarize, UPS contends that it decided to send Allen to

White's Creek on July 13, 2000, and July 24, 2000, because it was the most efficient way to transport the packages. The RB06 route was relatively short, so it was often used to transport overflow packages because it was easy for UPS to find other drivers to "cover" for the re-routed driver. Allen acknowledges that other drivers (though not senior "bid" drivers) were assigned to take overflow loads to the same location. (Allen Dep. at 210). Essentially, the decision on both occasions was a business determination that re-routing Allen would be the best course to take unanticipated overflow loads to Nashville. UPS's contract with the union allows it to make such last-minute decisions.

    **b.**  **Goodwater**

As with the White's Creek routes, UPS maintains that adding Goodwater to Alan's route was simply the most efficient way to transport packages. UPS claims that in mid-year 2000 the Alabama district began to experience an influx of "overflow" packages at the Montgomery Hub which were destined for the UPS Goodwater facility. Although those packages had previously been sent directly to Goodwater and Anniston, the Atlanta facility began rerouting the packages through the Montgomery Hub, creating a need for the Montgomery facility to transport the overflow packages. Allen's route was considered a relatively short route, and so UPS decided to add the return leg from Montgomery to Roebuck.

    **c.**  **Anniston**

UPS also presents legitimate nondiscriminatory reasons why it sent Allen on occasional routes through Anniston. Sometime after mid-year 2000, the Montgomery Hub experienced an influx of overflow packages that were rerouted from the Atlanta Hub

through the UPS Montgomery Hub rather than being directly sent to Anniston. UPS staffed the overflow by adding an extra leg on an as-needed basis to the RB06 route. Again, this decision is based on the relatively short length of the RB06 route.

### 3. Allen's Proof of Pretext

Next, Allen must prove that the "proffered reason was not the true reason for the employment decision. . . . [t]his burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. "*Burdine*, 450 U.S. at 256. Three types of evidence may be used in proving pretext: (1) comparative evidence; (2) statistical evidence; and (3) direct evidence of discrimination in the form of discriminatory statements and admissions. *See Miles v. M.N.C.*, 750 F. 2d 867, 870 (11th Cir. 1985) (citation omitted). In proving pretext a "plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it; the employee cannot succeed by simple quarreling with the wisdom of that reason." *Chapman*, 229 F.3d 1012 (citation omitted).

In this case, Allen attempts to prove discrimination through the use of comparative evidence. She attempts to prove that male workers in a comparable or lesser employment position to her own were treated more favorably than she was. Yet, as detailed below, there is simply no evidence to suggest that the UPS's explanations are unworthy of credence or

13

that discrimination was the driving force behind the decisions. In fact, additional evidence offered by UPS suggests that males frequently covered Allen's routes when she was otherwise unavailable. Moreover, all of the evidence offered by UPS suggests that the decisions were made in accordance with sound business judgment rather than discriminatory animus.

      a.    **White's Creek**

Allen offers no proof sufficient to establish that UPS's proffered reason was not the true reason for the employment decision. She alleges that other male employees could have been chosen, but she does not offer any proof that UPS was not motivated by a desire to route packages efficiently. This court will not argue with UPS over the best means to route packages and accordingly grants summary judgment in favor of UPS.

      b.    **Goodwater**

As with the White's Creek claim, in this case Allen has offered no evidence to suggest that decision to send her to Goodwater was a pretext for sex discrimination. UPS offers ample evidence that several other male drivers "covered" RBO6, or substituted for Allen when she was off work or called in sick or for vacation. In fact from July 28, 2000, until the end of February of 2001, Allen was off work approximately fifteen days and on each of these occasions the "cover driver" was male and took the load through Goodwater.

Allen also alleges that the choice of male drivers to bring feeder trailer loads from Montgomery back to Roebuck demonstrates discrimination. Here, UPS explains that additional drivers were needed to pick up trailers from Roebuck because the addition of the Goodwater leg made Allen too late in returning the packages. Allen does not dispute

14

that she was late in returning the packages. (Allen Dep. pp. 107-08). Allen also contends that UPS's disregard for her seniority over the "Birmingham" drivers also evidences discrimination. As with the White's Creek case, these arguments carry little weight. UPS has explained that seniority did not play a role in its decision. The drivers were already traveling back to Birmingham and that it added little time for them to drop off any loads that Allen once hauled from Montgomery. Allen's case is further weakened by the fact that she filed a claim with the union over the routes and those complaints did not result in a finding that a contract violation had occurred.

### c.  Anniston

As with the other routes, Allen cannot directly or indirectly demonstrate that routing her through Anniston was anything other than a means to efficiently distribute packages. UPS has thoroughly explained that her route was the best way to route the packages without compromising its service. Moreover, UPS records indicate that, from the beginning of August 2000 until the end of February 2001, the driver running the route RB06 was sent through Anniston approximately fifteen times. Allen was at work and ran the route on twelve of those days. On all three days when Allen was off, male drivers covered for her. In addition, Allen's claims that she should have been offered the "first right of refusal" also fail because seniority did not play a role in the decision to send the RB06 through Anniston when an overflow load was necessary. She identifies other male feeder drivers who allegedly could have taken the overflow loads to Anniston; however, she cannot prove that the reasons UPS offered for sending those drivers was a pretext for discrimination. Indeed,

it appears that a reasonable employer could have arrived at the very same conclusions that UPS did.

In conclusion, summary judgment is due to be granted to UPS on all of Allen's disparate treatment claims. Even assuming that she could establish that running extra routes to Anniston, White's Creek and Goodwater amounted to an adverse employment action, she does not provide sufficient evidence to establish that the decisions of UPS were based on anything other than sound business judgment. UPS has provided exhaustive explanations why it chose to route the packages in the manner that it did.Although this may have made life unpleasant, nay miserable for Allen, it does not prove that UPS targeted her for extra work because she was a woman.

### C.   Allen's Retaliation Claim

To establish a prima facie case of retaliation, "a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to produce a legitimate, nonretaliatory, reason for the adverse employment decision and if the defendant satisfies that burden, the plaintiff must prove that the proffered reasons are a pretext for retaliation. *EEOC v. Reichold Chemicals, Inc.*, 988 F.2d 1564, 1572 (11th Cir. 1993) (citations omitted).

The Eleventh Circuit has held that, in order to prove a causal connection between the protected expression and the adverse employment action, the two must not be "wholly

unrelated." *Clover v. Total System Serve.*, 176 F.2d 1346, 1354 (11th Cir. 1999). Where, as in this case, there is no direct evidence of a causal link, Allen must establish that the employer was aware of her protected activity and that the activity and the adverse employment action were in temporal proximity. *Griffen v. GTE Florida Bd. of Regents*, 182 F. 3d 1279, 1284 (11th Cir. 1999). Thus, Allen cannot succeed on a retaliation claim if she cannot establish that the decision-maker was actually aware of the protected expression at the time the adverse employment action took place or that awareness can be inferred from circumstantial evidence. *Goldsmith v. City of Atmore*, 996 F. 2d 1155, 1163 (11th Cir. 1993).

In this case, Allen's retaliation claim is based upon EEOC charges which were filed in the 1980's, more than ten years before the employment decisions at issue were made. Allen's retaliation claim is due to be dismissed because she cannot establish that Scott Raley, Tony Blaine, and Pete Price even knew about her previously filed EEOC charges when they made the decisions in this case. *Goldsmith*, 996 F.2d at 1163. Raley never mentioned the EEOC charges to Allen, nor did she hear him say anything about them. Raley was not aware that Allen had filed any EEOC charges or made any complaint of race or sex discrimination when the decision to send her to White's Creek in July of 2000 was made. Blaine and Price also did not know about the previously filed EEOC charges when the decision was made in mid-2000 to add a Goodwater leg to RB06 and send it through Anniston on occasion.

Assuming Allen could demonstrate that the decision-makers were aware of her 1980s EEOC charges, Allen also cannot establish the temporal proximity element of causal

17

connection because the decisions at issue in this case were made in 2000 and 2001, more than ten years after the EEOC charges were filed by Allen against UPS. In cases involving a span of time much shorter than ten years, courts have held that the temporal proximity element was lacking. *See, e.g. Wascura v. City of South Miami*, 257 F.3d 1238, 1244 (11th Cir. 2001 (three and one-half month period between protected conduct and adverse action does not establish causal connection); *Conner v. Schnuck Markets, Inc.,* 121 F. 3d 1390, 1391 (10th Cir. 1007) (holding that four-month time lag between plaintiff's participation in protected activity and his termination was, by itself, insufficient to justify an inference of causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming district court's holding that three-month period of time between plaintiff's protected activity and termination was insufficient to establish a causal connection).

As with Allen's charges of discrimination, even assuming Allen could establish a prima facie case for discrimination, UPS has articulated legitimate, non-discriminatory reasons for all of the decisions about which Allen claims and Allen cannot show those reasons were a pretext for retaliation.

In conclusion, this court grants UPS summary judgment because Allen has failed to establish that any of her supervisors were aware that she filed with the EEOC and she cannot establish that the activity and the adverse employment action were temporal in proximity. Even if she could establish a prima facie case, she cannot prove that UPS's decisions were motivated by a discriminatory intent. Accordingly, this court grants UPS's motion for summary judgment for Allen's charge of retaliation.

## V.     Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 15th of October, 2002.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE